**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Whaleco Incorporated, | No. CV-23-02451-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Temureviewer.com, et al., | |
| Defendants. | |

Plaintiff Whaleco Inc. ("Whaleco") moves for Default Judgment against Defendant registrants pursuant to Federal Rule of Civil Procedure 55(b)(2). (Doc. 37.) For the following reasons, the Court grants Whaleco's Motion, including its request for a permanent injunction and that the Court order transfer of ownership of the following domain names: <temupromos.online>, <temupromos.store>, <temuwin.com>, and <temuz.co> (collectively, the "Infringing Domain Names").

## I.      BACKGROUND

Whaleco (d/b/a TEMU) is a Delaware corporation with its principal place of business in Boston, Massachusetts. (Doc. 1 ¶ 10.) On or around, September 1, 2022, Whaleco was granted an exclusive license by Five Bells Limited, giving it the right and authority to use and enforce the "TEMU" trademark, including: United States Trademark Registration No. 7,164,306 for the word mark "TEMU" and United States Trademark Registration No. 7,145,476 for the TEMU Logo mark (collectively the "TEMU Marks"). (*Id.* ¶¶ 25-26; Doc. 1-2 at 41-45.)

Whaleco operates on online shopping platform available through the website domain https://temu.com. (Doc. 1 ¶ 22.) TEMU.COM is an online marketplace acting as an intermediary between consumers and sellers, manufacturers, and brands around the world. (*Id.* ¶ 24.) Additionally, Whaleco operates TEMU mobile applications, available through the Apple App Store and the Google Play Store. (*Id.* ¶ 22.)

Whaleco has continuously used the TEMU Marks in commerce throughout the United States since September 1, 2022. (*Id.* ¶ 28.) Whaleco spends a considerable amount of money on marketing and developing the brand in which the TEMU Marks are based. (*Id.* ¶ 32.)

On October 2, 2023, Defendant Doe 3 registered the domain name <temuz.co> and subsequently posted a live website at https://temuz.co without Whaleco's permission. (*Id.* ¶¶ 47-48.) The website purported to be an ecommerce site and included "TEMU" in both the domain name and in the top-left corner of the site in the same orange color as Whaleco's. (*Id.* ¶ 50.) Whaleco has no affiliation with this website. (*Id.*)

On October 26, 2023, Defendant Doe 4 registered the domain name <temuwin.com> and subsequently posted a live website at https://temuwin.com/download/ without Whaleco's permission. (*Id.* ¶¶ 51-52.) This website purported to be an informational website and blog, which included "TEMU" in both the domain name and in multiple places on the website. (*Id.* ¶ 54.) Additionally, the website displayed a logo similar to the TEMU Logo Mark, in an orange color that was similar to that used by Whaleco on its website and its packaging. (*Id.*)

On June 24, 2023, Defendant Doe 6 registered the domain <temupromos.online> and subsequently posted a live website at https://temupromos.online without Whaleco's permission. (*Id.* ¶¶ 59-61.)  The address resolved to a website that displayed the TEMU Marks and offered coupons for use on TEMU.COM. The website included "TEMU" in a logo, and in the domain name. (*Id.* ¶ 62.) Whaleco has no affiliation with this website. (*Id.*)

On August 1, 2023, Defendant Doe 7 registered the domain <temupromos.store> and subsequently posted a live website at https://temupromos.store without Whaleco's

permission. (*Id.* ¶¶ 63-64.)  The address resolved to a website that displayed the TEMU Marks and offered coupons for use on TEMU.COM. (*Id.* ¶ 66.) The website included "TEMU" in the logo, and in the domain name. Whaleco has no affiliation with this website. (*Id.*)

The domain registrar for the Infringing Domain Names is Namecheap, Inc., which is located in the District of Arizona. (*Id.* ¶¶ 5, 7.) Namecheap requires its registrants "to consent to personal jurisdiction in this Court for disputes between Namecheap registrants . . . and third parties." (*Id.* ¶ 5.)

On November 22, 2023, Whaleco filed its Complaint against the Defendants, alleging: (a) an *in rem* action for cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d); (b) an action for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (c) an action for unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); and (d) an action for trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c). (Doc. 1.)

On December 1, 2023, the Court entered an order authorizing alternative personal service of the Complaint, summons, and all papers in the case, on the Defendant registrants of the Infringing Domain Names. (Doc. 15.) The alternative service process was originally executed on Defendants on December 4, 2023. (Doc. 17.) After Namecheap, Inc. provided the names and contract information for Defendant Does 3-4 and 6-7, alternative service was again executed on the Defendants on December 8, 2023. (Doc. 18.)[1] Defendants failed to file an answer or otherwise respond the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. Accordingly, Whaleco applied for entry of default. (Doc. 35.) The Clerk of the Court entered default on January 12, 2024, pursuant to Rule 55(a) of the

---

[1] Namecheap, Inc. provided the names and contact information that the Doe Defendants provided to Namecheap, Inc. when registering the Infringing Domain Names: Defendant Doe 4 (the registrant of <temuwin.com>) is one Polyakov Andrey; Defendant Does 6 and 7 (the registrants of <temupromos.online> and <temupromos.store>) is a single individual, Mostafa Ibnelkhattab; and Defendant Doe 3 (the registrant of <temuz.co>) is one Robert Pandey. (Doc. 37 at 6 n.2.)

1    Federal Rules of Civil Procedure. (Doc. 36.) Whaleco then filed a Motion for Default
2    Judgment on February 7, 2024. (Doc. 37.) Because the Clerk of the Court entered default,
3    the Court takes the Complaint's factual allegations as true. *See Geddes v. United Fin. Grp.*,
4    559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the factual
5    allegations of the complaint, except those relating to the amount of damages, will be taken
6    as true.") (cleaned up).

7    **II.    LEGAL STANDARD**

8        Once a default is entered, the district court has discretion to grant default judgment.
9    *See* Fed. R. Civ. P. 55(b)(2); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *Eitel*
10   *v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986) (explaining that Rule 55 of the Federal
11   Rules of Civil Procedure requires a two-step process: an entry of default judgment must be
12   preceded by an entry of default). The following factors are to be considered when deciding
13   whether default judgment is appropriate:

14            (1) the possibility of prejudice to the plaintiff, (2) the merits of
             the plaintiff's substantive claim, (3) the sufficiency of the
15           complaint, (4) the sum of money at stake in the action, (5) the
             possibility of a dispute concerning material facts, (6) whether
16           default was due to excusable neglect, and (7) the strong policy
             underlying the Federal Rules of Civil Procedure favoring a
17           decision on the merits.

18   *Eitel*, 782 F.2d at 1471–72.

19       Because Whaleco is the party seeking default judgment, "it bears the burden of
20   demonstrating to the Court that the complaint is sufficient on its face and that the *Eitel*
21   factors weigh in favor of granting default judgment." *Norris v. Shenzhen IVPS Tech. Co.*,
22   No. CV-20-01212-PHX-DWL, 2021 WL 4844116, at *2 (D. Ariz. Oct. 18, 2021).

23   **III.   JURISDICTION, VENUE, AND SERVICE**

24       "When entry of judgment is sought against a party who has failed to plead or
25   otherwise defend, a district court has an affirmative duty to look into its jurisdiction over
26   both the subject matter and the parties." *Tuli v. Republic of Iraq*, 172 F.3d 707, 712 (9th
27   Cir. 1999).  And "[i]n the absence of an evidentiary hearing, the plaintiff need only make
28   a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th

Cir. 1990). If a plaintiff's proof is limited to written materials, only these materials need to demonstrate sufficient facts that support a finding of jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (cleaned up).

### A.    Personal Jurisdiction

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Arizona's long-arm statute conforms with the requirements of federal due process. Ariz. R. Civ. P. 4.2(a). Therefore, the analysis of personal jurisdiction under Arizona law is the same. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004).

For the exercise of personal jurisdiction to comport with federal due process, Defendants must have certain "minimum contacts" with Arizona such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The United States Supreme Court has recognized two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 255 (2017). A court has general personal jurisdiction—jurisdiction over "any and all claims"—when a defendant is essentially at home in the forum State. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co*, 326 U.S. at 317). Often, defendants are subject to general personal jurisdiction in the state of their domicile. *Bristol-Myers Squibb Co.*, 582 U.S. at 255. Whether the Court may exercise general jurisdiction over the defaulting Defendants is not at issue here.

Specific personal jurisdiction—limited to a narrower class of claims than general personal jurisdiction—exists when the defendant has taken "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Specific personal jurisdiction may also be established by party consent, such as through a forum selection clause. *See Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 145 (2023). Such clauses are presumptively valid. *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009) (citing *M/S Bremen v. Zapata Off-Shore*

*Co.*, 407 U.S. 1, 17 (1972)). And "forum selection clauses are to be specifically enforced unless the party opposing the clause shows that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Manetti-Farrow, Inc v. Gucci Am., Inc.*, 858 F.2d 509, 512 (9th Cir. 1988) (cleaned up).

Defendants' physical addresses are unknown to the Court. But, Whaleco alleges Defendants expressly consented to the Court's jurisdiction when they agreed to the Namecheap Registration Agreement, which requires:

> "[Namecheap registrants to] submit without objection . . . to the subject matter and personal jurisdiction of the courts . . . where [Namecheap is] located, currently those State or federal courts whose geographic districts include Maricopa County, State of Arizona."

(Doc. 1 ¶ 5.)

Here, Defendants acceptance of Namecheap's Registration Agreement establishes consent to personal jurisdiction. Because the Ninth Circuit has recognized that a forum selection clause alone is sufficient to confer personal jurisdiction, the Court finds it may exercise specific personal jurisdiction over Defendants. *See S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007).

## B.    Subject Matter Jurisdiction

The Court has original subject matter jurisdiction over any civil action that arises under any act of Congress relating to patents, copyrights, and trademarks. 28 U.S.C. §§ 1331, 1338; *Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296, 1300 (C.D. Cal. 1996). Whaleco alleges four federal claims: cybersquatting under 15 U.S.C. § 1125(d), trademark infringement under 15 U.S.C. § 1114, unfair competition and false designation of origin under 15 U.S.C. § 1125(a); and trademark dilution under 15 U.S.C. § 1125(c). (*See* Doc. 1.) Accordingly, the Court has subject matter jurisdiction over those claims.

## C.    Venue

Pursuant to 28 U.S.C. § 1391(b)(2) venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." "In a trademark suit brought under the Lanham Act, a 'substantial part' of the events giving rise

to the claims occur in any district where consumers are likely to be confused by the accused goods." *Golden Scorpio Corp. v. Steel Horse Bar & Grill*, 596 F. Supp. 2d 1282, 1286 (D. Ariz. 2009) (citations omitted). Venue is proper because the Infringing Domain Names were registered with Namecheap in Arizona, and the websites were accessible and likely to cause confusion among consumers within this District.

**D.     Service of Process**

On December 1, 2023, the Court entered an order authorizing alternative personal service of the Complaint, Summons and all papers in the case, on the Defendant registrants of the Infringing Domain Names. (Doc. 15.) In compliance with that Order, Whaleco properly served Defendants on December 4, 2023. (Doc. 17.) Namecheap then provided the names and contact information for Defendant Does 3-4 and 6-7 and alternative service was again properly executed on Defendants on December 8, 2023, with Summons and Complaint (Doc. 18); on December 29, 2023, with the preliminary injunction (Doc. 34), and on February 8, 2024, with the Motion for Default Judgment. (Doc. 38.)

**IV.     DEFAULT JUDGMENT**

**A.     The First, Fifth, Sixth, and Seventh *Eitel* Factors**

In cases like this, in which the defendant has not responded, nor participated in any litigation, the "first, fifth, sixth, and seventh [*Eitel*] factors are easily addressed." *Zekelman Indus. v. Marker*, No. CV-19-02109-PHX-DWL, 2020 WL 1495210, at *3 (D. Ariz. March 27, 2020).

The first factor weighs in favor of default judgment because denying Whaleco's Motion will leave it "without recourse for recovery." *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Prejudice would result if Whaleco's Motion was denied because it would lose the right to a "judicial resolution" of its claims. *See generally Elektra Ent. Grp. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2022) (citing *Eitel*, 782 F.2d at 1471–72). Due to Defendant registrants' failure take down the websites, and its failure to respond to Whaleco's Complaint, the only appropriate recourse Whaleco has is through litigation and this Motion.

The fifth factor weighs in favor of default judgment because the well-pleaded factual allegations in the Complaint are taken as true, and there is no "genuine dispute of material facts" that would preclude granting the Motion. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177.

The sixth factor weighs in favor of default judgment because Defendants were served. (Docs. 17, 34, 38.) Further, it is unlikely that Defendants failure to answer was due to excusable neglect. The Namecheap Registration Agreement explains that:

> [A]ny dispute arising under this Agreement may be served upon you by first class mail to the address listed by you in your account and/or domain name WHOIS information or by electronically transmitting a true copy of the papers to the email address listed by you in your account and/or domain name WHOIS information.

(Doc. 1-2 at 70.) Thus, Defendants were apprised that important communications may be sent to the addresses in which they were served. (*Id.*)

The seventh factor, which favors a decision on the merits, generally weighs against default judgment; however, Rule 55 of the Federal Rules of Civil Procedure "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (cleaned up). This factor is not sufficient to preclude the entry of default judgment in this case. *Warner Bros. Ent., Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1073 (C.D. Cal. 2004). Defendants have had notice of this lawsuit since December 4, 2023, and had ample time to answer or respond. (Doc. 17.) Defendants chose not to participate.

## B.    The Second and Third *Eitel* Factors

The second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint—are often "analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Viet. Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (citing *PepsiCo*, 238 F. Supp. 2d at 1175). The Court addresses Whaleco's claims under 15 U.S.C. § 1125(d) for cybersquatting; 15 U.S.C. § 1114 for federal trademark infringement; 15 U.S.C. § 1125(a) for federal unfair competition; and 15 U.S.C. § 1125(c) for trademark dilution.

(*See* Doc. 1 ¶¶ 81-108.)

### 1.        Lanham Act Claims

Lanham Act Claims for federal trademark infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125(a) are subject to the same legal standards. *Mintz v. Subaru of Am., Inc.*, 715 F. App'x 618, 622 (noting that the elements needed to establish federal unfair competition are identical to the elements needed to establish trademark infringement); *see also Brookfield Commc'ns, Inc. v. West Coast Ent. Grp.*, 174 F.3d 1036, 1067 n.8 (9th Cir. 1999).

To prevail, Whaleco must show that it has ownership of a valid mark and that Defendants' distribution of the infringing content "is likely to cause confusion, or to cause mistake, or to deceive." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 935 (9th Cir. 2015) (quoting *Fortune Dynamic, Inc v. Victoria's Secret Sores Brand Mgmt.*, 618 F.3d 1025, 1030 (9th Cir. 2010)). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). Further, "the confusion must be probable, not simply a possibility." *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996) (cleaned up).

The Court must first analyze whether Whaleco has a valid, protectable trademark interest in the TEMU mark. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1046–47. Whaleco's exclusive license granted by Five Bells Limited gives it the right to use and enforce the "TEMU" trademark. This "constitutes prima facie evidence of the validity of the registered mark and of [Whaleco's] exclusive right to use the mark on the goods and service specified in the registration." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1047 (citing 15 U.S.C. §§ 1057(b);1115(a)). Defendants have not produced rebuttal evidence that they are entitled to use the TEMU Marks.

Next, to determine the likelihood of confusion to the "reasonably prudent consumer in the marketplace," the Court considers eight factors: "(1) [s]trength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4)

evidence of actual confusion; (5) marketing channels; (6) types of goods and purchaser care; (7) intent; and (8) likelihood of expansion." *Dreamwerks Prod. Grp.*, 142 F.3d at 1129.

### i.      Strength of the Mark

When analyzing the first factor, courts examine the mark's conceptual strength and commercial strength. *Network Automation, Inc. v. Adv. Sys. Concepts*, 638 F.3d 1137, 1149 (9th Cir. 2011). Conceptual strength classifies the mark "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary or fanciful." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058. And "commercial strength is based on actual marketplace recognition." *Network Automation, Inc.*, 638 F.3d at 1149 (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058) (cleaned up).

On the conceptual prong, arbitrary marks are considered "strong marks, entitled to a greater degree of protection than common or weak marks*." Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (cleaned up). Whaleco's TEMU mark is arbitrary because "TEMU" is an acronym for **T**he **E**verything **M**arketplace **U**nlimited and "has no meaning in a foreign language." (Doc. 1-2 at 44.) This mark uses portions of "common words in a fictious and arbitrary manner to create a distinctive mark which identifies the source of the product." *Dreamwerks Prod. Grp.*, 142 F.3d at 1130 n.7; *see also Official Airline Guides, Inc.*, 6 F.3d at 1390.

In addition to marketplace recognition, commercial strength may be established by "significant investment of resources to advertise the mark." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 758 (9th Cir. 2018). The Court finds that the TEMU Marks are commercially strong. The nine months following the platforms launch date are indicative of its commercial strength. In this time, the TEMU platform was downloaded over 100 million times. (Doc. 1 ¶ 36.) Additionally, "Whaleco has expended substantial time, money, and resources, marketing, advertising, and promoting TEMU.COM under the TEMU Marks." (*Id.* ¶ 32.) For instance, Whaleco invested significant resources into the TEMU Marks when they created the "Shop like a billionaire" advertisement that aired

- 10 -

during 2023 Super Bowl. (*Id.* ¶ 34.) Thus, the Complaint adequately demonstrates the TEMU Marks are conceptually and commercially strong, which weighs in favor of Whaleco in the infringement analysis.

### ii.    Proximity or Relatedness of the Goods

The second factor examines the relatedness of the two products. "The proximity of goods is measured by whether the products are (1) complementary; (2) sold to the same class of purchasers, and (3) similar in use and function." *Network Automation, Inc.*, 638 F.3d at 1150 (citation omitted). Defendants' websites offer online shopping, gift cards, and rewards to be used on Whaleco's website. (Doc. 1 ¶ 2.) The online shopping market is large, but Defendants are specifically using the TEMU Marks to promote their websites, which means they intend to offer products to the same target audience. (*Id.*) Because these products are marketed and sold to the same intended consumer target market, there is a likelihood that consumers will be confused. *See Dreamweks Prod. Grp.*, 142 F.3d at 1130. Thus, this factor weighs for Whaleco.

### iii.    Similarity of Sight, Sound, and Meaning

The third factor weighs the similarity of the marks, which is tested based on sight, sound and meaning. *Network Automation Inc.*, 638 at 1150 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 351 (9th Cir. 1979)). "The greater the similarity of the defendant's mark to the plaintiff's mark, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Defendants domains <temupromos.online>, <temupromos.store>, <temuwin.com>, and <temuz.co> are very similar to Whaleco's <TEMU.COM> domain. All of Defendants' websites include the use of "TEMU" in the domain name and the Logo Mark on their webpage. (Doc. 1 at 14–20.) Additionally, Defendants' websites are commercial platforms, and their revenue comes from selling consumer goods, collecting personal information, or visits to the websites themselves. (*Id.*) This indicates significant overlap in the marketplace. Because both websites—Whaleco's and Defendants'—include the TEMU Logo and "TEMU" in the domain name, and significant overlap in the marketplace, there is a significant likelihood

of confusion. (*Id.*) Thus, this factor weighs for Whaleco.

### iv.    Evidence of Actual Confusion

The fourth factor considers evidence of actual confusion. "The failure to *prove* instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove, difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1050 (citation omitted) (emphasis in original). Although Whaleco did not provide evidence of actual confusion between its domain and Defendants' domains, this does not weigh against Whaleco.

### v.    Marketing Channels

The fifth factor analyzes "whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (citing *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir.1987)). Both Whaleco and Defendants distribute their products via a common marketing channel—the internet. (Doc. 1 at 24–25.) Additionally, because Defendants are seeking to appeal to the exact customers that are already familiar with the TEMU product, they are drawing from the same class of consumers. Thus, the fifth factor weighs in favor of Whaleco.

### vi.    Types of Goods and Purchaser Care

The sixth factor examines "the type of good or service offered and the degree of care one would expect from the average buyer exercising ordinary caution." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014). Consumers searching for expensive products online are expected to be more sophisticated. *Network Automation Inc.*, 638 F.3d at 1153 (citation omitted). Conversely, consumers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983). No determination as to the expensiveness or inexpensiveness can be made here. Whaleco's website operates as an intermediary for buyers and sellers. (Doc. 37 at 2.) Meaning, the

1   expensiveness of the product offered varies considerably between who the seller and buyer

2   are. Thus, this factor of determining the average buyer on Whaleco's website weighs

3   neutral with respect to the confusion analysis.

vii.   <strong>Intent</strong>

5          The seventh factor weighs the alleged infringer's intent. "When the alleged infringer

6   knowingly adopts a mark similar to another's, reviewing courts presume that the defendant

7   can accomplish his purpose: that is, the public will be deceived." *Network Automation Inc.*,

8   638 F.3d at 1153 (citation omitted). A defendant's knowledge that he adopted a mark

9   confusingly similar to another's mark may be actual or constructive. *Brookfield Commc'ns,*

10  *Inc.*, 174 F.3d at 1059 (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d

11  149, 157 (9th Cir. 1963)). Moreover, when a defendant profits from the public's confusion,

12  it is some evidence of intent to deceive. *See Playboy Enterprises, Inc. v. Netscape*

13  *Commc'ns Corp.*, 354 F.3d 1020, 1028–29 (9th Cir. 2004) (finding that a defendant

14  collecting revenue from users clicking potentially misleading ads demonstrated intent to

15  deceive the public). Here, the Infringing Domain Names include Whaleco's TEMU word

16  mark, and consumers will likely assume that Whaleco is affiliated with these domain names

17  (Doc. 1 ¶¶ 50, 54, 62, 66); the Defendant registrants have taken steps to conceal their

18  identities through using Withheld for Privacy ehf (*id.* ¶ 75); the Infringing Domain Names

19  are used to divert consumers away from TEMU.COM to sites not endorsed by Whaleco

20  (*id.* ¶ 77); and, as a fanciful mark, the TEMU word mark is inherently distinctive and

21  famous. The totality of circumstances demonstrates that the Defendants have acted with

22  bad faith intent to profit off the TEMU Marks. Thus, this factor weighs in favor of Whaleco.

viii.   <strong>Likelihood of Expansion</strong>

24         The eighth and final factor considers the likelihood of expansion. "Inasmuch as a

25  trademark owner is afforded greater protection against competing goods, a 'strong

26  possibility' that either party may expand his business to compete with the other weigh in

27  favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (citing

28  Restatement of Torts § 731(b) & Comment c). And, "when goods are closely related, any

- 13 -

1    expansion is likely to result in direct competition." *Id.* Because Defendants and Whaleco

2    are both in the e-commerce market, the potential that one or some of the Defendnats will

3    try to compete with Whaleco is strong. This final factor also suggests a strong likelihood

4    of confusion.

5        Six factors of the "reasonably prudent consumer test" favor Whaleco, including:

6    strength of the mark, proximity or relatedness of the goods, similarity of sight, marketing

7    channels, intent, and likelihood of expansion. Accordingly, Whaleco has sufficiently stated

8    claims of federal trademark infringement and federal unfair competition. Because

9    Whaleco's allegations are to be taken as true, it has therefore stated claims for federal

10   trademark and unfair competition on which it may recover. *Geddes*, 559 F.2d at 560.

11                    **2.    Cybersquatting Claim**

12       For claims for cybersquatting under the Anticybersquatting consumer Protection

13   Act, Whaleco must prove that "(1) the defendant registered, trafficked in, or used a domain

14   name; (2) the domain name is identical or confusingly similar to a protected mark owned

15   by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark."

16   *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010).

17       First, Whaleco demonstrated Defendants registered Infringing Domain Names—

18   <temupromos.online>, <temupromos.store>, <temuwin.com>, and <temuz.co>. (Doc. 1 at

19   14–20.) Second, Defendants include the word "TEMU" in their domain name, similar to

20   Whaleco's <TEMU.COM>. (*Id.*) The additions in Defendants' domains: "promos.online,"

21   "promos.store," "win," and "z.co" are "slight differences" from Whaleco's website name

22   and therefore are "irrelevant." *ICON Health & Fitness Inc. v. pro-form.com*, No.

23   CV-15-01981-PHX-BSB, 2017 WL 4797794, at *6 (D. Ariz. Sept. 12, 2017) (citing

24   *DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 206 (6th Cir. 2004)). Thus, Defendants'

25   domain names are confusingly similar to Whaleco's <TEMU.COM>.

26       Third, the Court finds that Defendants acted with bad faith intent to profit from the

27   TEMU Marks. There are "nine nonexclusive factors for courts to consider in determining

28   whether bad faith exists." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009).

But the court does not need to "march through the nine factors" because their use is permissive. *Id.* (citation omitted). Here, factors one, five, and eight are most informative:

> (I)     the trademark . . .  in the domain name;
>
> . . . .
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> . . . .
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names . . .

Federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(B)(i).

First, Defendants Infringing Domain Names all include the use of the TEMU Mark in the domain name, which weighs in favor of a bad faith finding. (Doc. 1 at 14–20.) Second, Defendants use the Infringing Domain Names to divert Whaleco customers to websites that are represented by marks confusingly similar to the TEMU Marks either by purporting to offer coupons, offering products for sale, or endorsing products, that are not endorsed by Whaleco. (*Id.*) *See Cosmetic Alchemy, LLC v. R&G, LLC*, No. CV-10-1222-PHX-GMS, 2010 WL 4777553, at *6–7 (D. Ariz. Nov. 17, 2020) (finding bad faith where the counter-defendant intended to profit from a domain name by diverting customers and distributors away from the original website). Thus, Whaleco has sufficiently stated a claim for cybersquatting.

### 3.      Trademark Dilution

Dilution occurs when another party's use of a mark "weaken[s] the commercial magnetism of [the] marks and diminish[es] their ability to evoke their original associations." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) (citation omitted). A plaintiff must prove:

> (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's

use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1164 n.4 (9th Cir. 2011). "[A] mark is famous if it is widely recognized by the general consuming public of the Untied States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

Here, the TEMU Marks are famous for purposes of a dilution claim. Prior to Defendants' domain registrations, Whaleco continuously used the TEMU Marks in connection with the sale and marketing of its products. (Doc. 1 ¶ 28.) The "Shop like a billionaire" commercial aired during the 2023 Super Bowl—an event that attracts millions of viewers. (*Id.* ¶ 34.) Whaleco has had substantial sales of goods from its ecommerce platform under the TEMU Marks throughout the U.S. (*Id.* ¶¶ 34-36.)

Such facts prove that the TEMU Marks are "widely recognized by the general consuming public of the United States as a designation of source of the goods or services" of Whaleco. By using the TEMU Marks on their commercial websites—after the marks became famous—Defendants sought to unfairly capitalize on the TEMU Marks' goodwill. Defendants' uses of the TEMU Marks tarnish the goodwill of and reputation of Whaleco, supporting a finding of trademark dilution.

## C.    The Fourth *Eitel* Factor

Under the fourth *Eitel* factor, the Court considers the amount of money at stake in relation to the seriousness of the defendant's conduct. *See PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. "If the sum of money at stake is completely disproportionate or inappropriate, default judgment is disfavored." *Century Fox Film Corp. v. Streeter,* 438 F. Supp. 2d 1065, 1071 (D. Ariz. 2006). In contrast to a complaint's other allegations, allegations pertaining to damages are not taken as true when considering a motion for default judgment. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (citations omitted). A district court has "wide latitude" in determining the amount of damages to award upon default

judgment. *James v. Frame*, 6 F.3d 307, 310 (9th Cir. 1993).

Whaleco does not seek monetary damages. Rather, it seeks injunctive relief from Defendants' use of the TEMU Marks. (Doc. 1 at 30–31.) Accordingly, this factor favors granting default judgment.

### D.    Relief Sought—Permanent Injunction and Transfer of Domain Names

Whaleco requests Defendants be permanently enjoined from five activities: (1) the use of words and logos identical to or confusingly similar to the TEMU Marks; (2) operating the Infringing Domain Names; (3) taking any action to transfer, sell, copy, or transmit the Infringing Domain Names from their current registrar to an to an other registrar; (4) using, linking, transferring, selling, exercising control over, or otherwise owning the Infringing Domain Names; and (5) engaging in conduct likely to cause confusion, deception, or mistake, trademark infringement, dilution, false designation of origin, cybersquatting, or unfair competition under the law of the United States. (Doc. 1 at 30–31.) The Lanham Act empowers the Court to "grant injunctions according to the rules of equity and upon such terms as the court may grant injunctions according to the rules of equity and upon such terms as the court may deem reasonable, to prevent the violation of a mark holder's rights." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177 (citing 15 U.S.C. § 1116(a)) (internal citations omitted). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Whaleco must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

The Lanham Act adds a statutory layer to the irreparable harm analysis for trademark infringement, which creates a "rebuttable presumption of irreparable harm when a permanent injunction is sought to remedy an established trademark violation." *Y.Y.G.M.*

*SA v. Redbubble, Inc.*, 75 F. 4th 995, 1005 (9th Cir. 2023) (citing 15 U.S.C. § 1116(a)) (original quotations omitted); *see also AK Futures LLC v. Boyd St. Distro, LLC*, 35 F. 4th 682, 694 (9th Cir. 2022). Thus, there is a rebuttable presumption of irreparable harm here.

The Court finds that Defendants' continued actions would cause Whaleco irreparable injury that cannot be fully compensated by any monetary damages. The balance of hardships also favors Whaleco (i.e., source, origin, or approval of goods and services associated with the TEMU Marks, or devaluation of Whaleco's goodwill and business reputation). (Doc. 1 at 2, 29.) And the public interest is not disserved by granting this injunction. *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in trademark cases . . . serves the public interest.").

Additionally, "[i]n any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order . . . the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). But "only upon proving the rigorous elements of cybersquatting under the [Anticybersqautting Consumer Protection Act (15 U.S.C. § 1125(d))] have plaintiffs successfully forced the transfer of an infringing domain name." *Interstellar Starships Servs. v. Epix Inc.*, 304 F.3d 936, 948 (9th Cir. 2002). In this case, Whaleco has sufficiently met its burden of establishing its cybersquatting claim. Thus, transfer of the Infringing Domain Names is warranted.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** granting Whaleco's Motion for Default Judgment Against Defendants (Doc. 37).

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and against Defendants.

**IT IS FURTHER ORDERED** that the Court will enter permanent injunction by separate order.

**IT IS FINALLY ORDERED** that Whaleco shall file its motion for attorneys' fees

and costs, if any, that complies in all respects with LRCiv 54.2, within (14) days of entry of this Order.

Dated this 9th day of April, 2024.

Michael T. Liburdi
United States District Judge